RAFAEL LOPEZ and INES LOPEZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lopez v. Commissioner
Docket No. 2333-88
United States Tax Court
T.C. Memo 1990-450; 1990 Tax Ct. Memo LEXIS 494; 60 T.C.M. (CCH) 574; T.C.M. (RIA) 90450; August 22, 1990, Filed *494 Decision will be entered under Rule 155. Luis Medina, for the petitioners. Frances D. Sheehy, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Section
Section
Section
Year
Deficiency
6653(a)(1) [1]
6653(a)(2)
6653(b)(1)
1982
$ 31,696.00
--
-- $ 15,848.00
1983
$    413.00
$ 20.65
*  --
1984
$    317.00
$ 18.55
** --
Additions to Tax
Section
Section
Year
Deficiency
6653(b)(2)
6661 1982
$ 31,696.00
*** $ 7,924.00
1983
$    413.00
-- 1984
$    317.00
-- For 1982, respondent posits, in the alternative, that petitioners are liable for additions to tax for negligence under section 6653(a)(1) and (2). Petitioners concede the 1983 and 1984 deficiencies; respondent concedes the 1983 and 1984 additions to tax. Thus, only the correctness of respondent's determinations *495 for 1982 remains. Specifically, the issues for decision are: (1) whether petitioners understated their 1982 income in the amount of $ 56,256.95 (respondent originally determined that petitioners had $ 84,493 of unreported income in 1982; as a result of documents provided respondent by petitioners on the eve of trial, respondent concedes error with respect to $ 28,236.05 of the previously determined amount for 1982); (2) whether they are liable for additions to tax for fraud pursuant to section 6653(b)(1) and (2); or, in the alternative, additions to tax for negligence pursuant to section 6653(a)(1) and (2); and (3) whether they are liable for an addition to tax for substantial understatement of income tax pursuant to section 6661. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and accompanying exhibits are incorporated herein by this reference. Rafael and Ines Lopez, husband and wife, resided in Hialeah, Florida, at the time they filed their petition. They timely filed a joint Federal income tax return for 1982. Respondent used the source and application of funds method in reconstructing petitioners' 1982 income. Specifically, *496 respondent determined that petitioners used $ 34,000 of unreported income to pay off a mortgage on a house located in Miami and $ 50,000 to purchase a house located in Hialeah. Background
Petitioners came to the United States from Cuba in 1970, and lived in New York for eight years. Mrs. Lopez was a full-time housewife; Mr. Lopez worked as a custodian of St. Peters Church in Yonkers, New York, until 1978. His income from 1970 to 1978 was under $ 10,000 per year. St. Peters Church did not provide the Lopez family with housing, utilities, clothing, food or transportation. The only fringe benefit St. Peters Church provided the Lopez family was a reduction in private school tuition for their daughter, Olga. Petitioners moved to Miami in 1978. Mr. Lopez began working as a carpenter at Allmand Boats, Inc., earning less than $ 10,000 a year. Mrs. Lopez remained a housewife. Rosario Lopez Mosqueda Gomes (Rosario) is petitioners' oldest child. In 1982, she was 27 years old. During 1976 and 1977, her husband, Jorge Mosqueda, earned $ 10,515.75; his earnings were the only source of the family's income. Rosario had a son, Francisco, on September 2, 1977. Rosario was divorced in 1978 and *497 received $ 16,000 to $ 18,000 in her divorce settlement. (The funds came from the sale of jewelry which she and her husband had accumulated.) Following her divorce and prior to 1979, Rosario's net income was minimal (below $ 2,200 a year). Between 1979-1982, Rosario earned approximately $ 9,700 per year. Olga Lopez (Olga), petitioners' second oldest child, was 19 years old in 1982. Between 1979 and 1982, Olga, as a student, was able to earn $ 18,317 from odd jobs. Francisca Lopez (Francisca), the youngest child of petitioners, was ten years old in 1982. The Lopez family "adopted" Wilfredo Guilarte (Wilfredo), a Cuban refugee. Wilfredo was married, with two children born in 1970 and 1976, and was employed as a janitor in a school. During 1971 and 1982, Wilfredo earned between $ 2,300 and $ 6,700 per year in gross wages. Petitioners claim that their children and Wilfredo provided them with money over the years. 1982 Cash Transactions
In November 1979, petitioners purchased a $ 35,500 home (as their principal residence) in Miami, Florida (hereinafter "Carol City house"), with a cash down payment of $ 1,500 and a mortgage of $ 34,000. On May 17, 1982, petitioners paid off the mortgage, *498 using the following sources of cash: -- $ 11,000.00 from Mrs. Lopez' Bank of Miami Account -- $ 17,236.05 from Mrs. Lopez' or Rosario's First National Bank of Greater Miami Account -- $ 6,256.95 from an unknown source On November 9, 1982, petitioners purchased a home located in Hialeah, Florida (the Hialeah house), with a cash down payment of $ 50,000, assumption of a first mortgage in the amount of $ 26,200, and a purchase money second mortgage in the amount of $ 23,500 with a balloon payment due in one year. Of the $ 50,000 down payment on the Hialeah house, $ 27,000 was paid by the following cashier's checks: Purchaser
Bank
Amount
Date
Rafael Lopez
Royal Trust Bank
$ 6,000 11-5-82
Ines Lopez
Bank of Miami
8,000 11-9-82
Olga Lopez
Bank of Miami
5,000 11-9-82
Wilfredo Guilarte
Royal Trust Bank
8,000 11-9-82
Mrs. Lopez obtained the funds to purchase the cashier's check from her Bank of Miami account number XXX-XX164-5. It is not known where the others obtained the funds to purchase their respective cashier's checks. The remaining $ 23,000 cash that petitioners used to complete the down payment came from an unknown source and method of payment. Two months after purchasing the Hialeah house, on January *499 17, 1983, petitioners sold the Carol City house for $ 54,000. Petitioners received proceeds in the amount of $ 46,715.20 and an escrow refund in the amount of $ 717. The next day, petitioners used a portion of these proceeds to purchase a cashier's check in the amount of $ 25,366.40 to pay off the purchase money second mortgage on the Hialeah house. They used the balance of the proceeds to furnish the Hialeah house. Petitioners' 1983 Federal income tax return did not report the sale of the Carol City house. Bank Account Activity
On October 25, 1985, Mrs. Lopez met with Revenue Agent Richard Cosler (Cosler) and, through an interpreter, advised him that petitioners did not maintain bank accounts, savings accounts, or checking accounts. However, on March 3, 1989, 11 days before the trial of this case, petitioners provided respondent with records of the following bank accounts: First National Bank of Greater Miami savings account number XXXXX2405, and Bank of Miami savings account number XXX-XX164-5, both of which were in the names of Mrs. Lopez and Rosario. As of December 31, 1981, the account balances of the above-mentioned accounts were: First National Bank of Greater Miami
$ 17,105.66
The Bank of Miami
$ 11,389.72
TOTAL
$ 28,495.38
The *500 account records for Bank of Miami account number XXX-XX1645 contained alterations of the entries for the months September through December, in which the years were changed from 1982 to 1983. Cash deposits totalling $ 18,000 were made to the savings account at the First National Bank of Greater Miami between April and June 1981. In May 1981, $ 2,000 was withdrawn from the account; on February 23, 1982, another $ 17,236.05 was withdrawn (the account was subsequently closed on February 25, 1982, through a $ 100.39 withdrawal). The $ 17,236.05 withdrawal provided part of the funds used to pay off the mortgage on petitioners' Carol City house. Cash deposits totalling $ 14,800 were made to Bank of Miami savings account number XXX-XX164-5 between July and August 1981; additional deposits totalling $ 11,700 were made between March and October 1982. In 1981, $ 3,720 was withdrawn from the account; additional withdrawals totalling $ 22,316 were made in 1982. Mrs. Lopez withdrew $ 11,000 (of the $ 22,316 total) from the account on February 23, 1982, and used it towards payment of the mortgage on the Carol City house. She withdrew another $ 8,360 on November 9, 1982, using most of the proceeds *501 to purchase an $ 8,000 cashier's check, which was applied as part of the down payment for the Hialeah house. The account at the Bank of Miami was closed on January 6, 1983. Other Sources of Cash
At the October 25, 1985 meeting with Cosler, Mrs. Lopez advised him (through her interpreter) that petitioners did not have a cash hoard. She further stated that her children provided the cash to pay off the Hialeah house mortgage. On January 2, 1986, during a meeting with Cosler, Mr. Lopez claimed that petitioners kept money in a small metal box which had been kept in his New York attic. Mr. Lopez and Rosario stated that the total amount of cash which was brought from New York in the small metal box was $ 74,000-78,000 ($ 42,000 contributed by petitioners; $ 16,000-$ 18,000 contributed by Rosario; $ 6,000 contributed by Olga; and $ 10,000-$ 12,000 contributed by Wilfredo). During the audit, petitioners were evasive and uncooperative. At trial, petitioners and Rosario gave conflicting testimony as to the alleged cash hoard. Petitioners testified that they had $ 40,000 in a little blue purse which was kept in a closet in their New York home. Both claimed that the largest amount of cash which *502 was kept in the purse and brought from New York was $ 40,000, which amount was attributable to saving $ 5,000 per year over eight years. On the other hand, Rosario testified that the money came from a metal box which was kept in the attic in New York and that the largest amount of cash at one time was $ 86,000. Living Expenses
Between 1971 and 1982, Mr. Lopez supported himself, his wife, three daughters, and a grandson, Francisco. While in New York, petitioners owned a 1971 Chevrolet. Their moving expenses from New York to Florida were approximately $ 2,000, and rental expenses for 1978-1979 were approximately $ 3,000. Petitioners paid approximately $ 5,000 towards the down payment and closing costs on November 6, 1979 for their Carol City house. Their mortgage payments from November 1979 through January 1983 were between $ 350 to $ 500 per month for 38 months. In 1981, petitioners purchased a 1979 Oldsmobile for cash in the amount of $ 5,946.92, and Rosario purchased a new 1981 Oldsmobile for cash. OPINION 1. Understatement of Income
The first issue is whether petitioners understated their taxable income for 1982 to the extent determined by respondent. Gross income includes *503 all income from whatever source derived. Sec. 61; . Where the taxpayer has failed to report on income tax returns amounts of income, the government may employ indirect methods where records are not sufficient to otherwise establish income. . A taxpayer is required to keep sufficient records to enable respondent to determine his correct tax liability. Sec. 6001. In the absence of such records, respondent may compute the taxpayer's income by any method that clearly reflects income. Sec. 446(b); . The use of the source and application of funds method of reconstructing income (also known as the cash expenditures method) has long been an acceptable method of determining income. See, e.g., ; ; , affd. . The source and application of funds method is based on the assumption that the amount by which the taxpayer's application of his funds exceeds his known sources of income *504 is taxable income, absent some showing by the taxpayer of a nontaxable source. , affd. per curiam . Proper use of the source and application of funds method of income reconstruction requires that respondent either present evidence of a likely source of currently taxable income or negate nontaxable sources of income and track down relevant leads which might show alternative sources of nontaxable income if such leads are reasonably susceptible to being checked. ; ; , affg. a Memorandum Opinion of this Court; . "[W]here relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of [petitioners]." ; ; . Respondent used the source and application of funds method to determine petitioners' *505 income for 1982. Petitioners were evasive and uncooperative with respondent during discovery and until the eve of trial. At trial, respondent's agent testified credibly as to the leads available as well as likely sources of taxable income and negated nontaxable sources of income. We conclude that respondent's use of the source and application of funds method of income reconstruction was proper. For 1982, respondent determined that petitioners received unreported income in an amount sufficient to pay off a mortgage in May 1982, in the amount of $ 34,493, and make a down payment of $ 50,000 on a second home in November 1982. Other than bank deposits as of December 31, 1981, in the amount of $ 28,495.38, of which $ 28,236.05 was used as a portion of the mortgage payoff of $ 34,493, petitioners failed to present any consistent or believable explanation as to the nontaxable source of the funds for these cash transactions. (As previously stated, respondent conceded that the amount of unreported income is $ 56,256.95 ($ 84,493- $ 28,236.05) based on the bank records provided him by petitioners on the eve of trial.) We deem it unlikely that petitioners with two children, ages eight and *506 fifteen, and a baby on the way, arrived penniless in the U.S. in 1970, and eight years later were able to accumulate some $ 84,000, when, during this period, Mr. Lopez received a very low salary. We do not accept such an Horatio Alger story. In 1978, the family moved to Miami, Florida, where Mr. Lopez worked as a carpenter in a boat factory, with periods of unemployment. Upon arriving in Florida, the family rented the Carol City house for a year and then in November 1979, purchased that home with a small down payment and a mortgage of $ 34,000. In 1981, the family experienced a sudden availability of cash from some unknown source. At the end of 1981, petitioners had a total savings of $ 28,495.38 and two new cars; petitioners' total gross reported income for the entire family during 1981 was only $ 30,627. In 1982 (the tax year at issue), the Lopez family continued to experience a similar positive cash flow. During 1982, the petitioners paid off the $ 34,493 mortgage, deposited $ 11,700 in savings, put a $ 50,000 cash down payment on a new house, and had a balance of $ 1,076.74 in savings. All of this occurred in a year when the total gross reported income of the entire family *507 was only $ 26,442. Petitioners did not establish a nontaxable source of funds, such as cash on hand, gifts, inheritance or loans. Their testimony was unconvincing and contradictory. They presented conflicting testimony regarding the amount of the cash hoard and its location, i.e., whether it was in a purse or metal box. Leaving aside the question of how petitioners could have accumulated a large cash hoard, given their modest level of earnings, we simply do not believe that such a cash hoard actually existed. Mr. Lopez testified that he earned income from odd jobs which he never reported as income. On brief, petitioners assert that such underreporting occurred over a period of years now barred by the statute of limitations. While it is likely that petitioners underreported income prior to 1982, they failed to present any evidence which would enable us to allocate any part of the unreported income to years other than 1982. In conclusion, we hold that petitioners had unreported income in 1982 in the amount of $ 56,256.95. 2. Fraud -- Section 6653(b)
The next issue for decision is whether petitioners are liable for additions to tax under section 6653(b)(1) and (2) for 1982. Section *508 6653(b)(1) provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. Section 6653(b)(2) provides that there shall be added to the tax under section 6653(b)(1) an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment which is attributable to fraud. The Commissioner has the burden of proving, by clear and convincing evidence, that there is an underpayment and that some part of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b); , cert. denied ; , affd. without published opinion . The Commissioner will carry his burden if he demonstrates that the taxpayer intended to evade taxes which he knew or believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. , cert. denied ; , *509 affg. a Memorandum Opinion of this Court; , modified , affd. . The existence of fraud is a question of fact to be determined from an examination of the entire record. ; . Fraud is never presumed, but rather must be established by affirmative evidence. . Circumstantial evidence is permitted where direct evidence of fraud is not available. ; ; ; . Fraud may properly be inferred where an entire course of conduct establishes the necessary intent. ; . The precise amount of underpayment resulting from fraud need not be proved. . The statute only requires a showing that "any part" of an underpayment results from fraud. Based on the record in this *510 case, we find that petitioners engaged in a pattern of conduct consistent with a fraudulent intent to evade taxes. They substantially understated their tax liability for 1982 and admit to having unreported income for prior years. Petitioners' evinced evasive and uncooperative conduct during the course of the examination. Such conduct indicates an effort to conceal the true facts concerning the extent of their income. . Petitioners made multiple misrepresentations to the revenue agent, cancelled interviews, failed to disclose the existence of bank accounts until the eve of trial, and provided altered bank records. All of these actions indicate an intent to evade tax. . Petitioners argue that the inconsistencies are a result of misunderstanding or mistake. The record, however, is clear that petitioners had competent translators at each interview, and, in fact, that Mr. Lopez understood English. Petitioners cannot claim innocence from being part of an inept and unsuccessful scheme to evade taxes. Petitioners intentionally made deposits in amounts less than $ 10,000 to avoid the Federal currency transaction *511 reporting requirements, sometimes within days of each other. In addition, they purchased cashier's checks in amounts under $ 10,000 at several banks, using several family members. Accordingly, we conclude that respondent has established fraud by clear and convincing evidence. Thus, we sustain respondent's determination of additions to tax pursuant to section 6653(b)(1) and (2) for taxable year 1982. Having found petitioners liable under section 6653(b), we need not address respondent's alternate claim for additions to tax for negligence pursuant to section 6653(a)(1) and (2). 3. Section 6661 Addition
The final issue is whether petitioners are liable for an addition to tax pursuant to section 6661. For tax returns due after December 31, 1982, section 6661(a) imposes an addition to tax on any underpayment attributable to a substantial understatement of income tax. Section 6661(b)(1) defines a substantial understatement of income tax as an understatement exceeding the greater of 10 percent of the tax required to be shown on the return for the year or $ 5,000. The section 6661 addition to tax applies at a rate equal to 25 percent of the underpayment. The rate was increased to 25 *512 percent by section 8002(a) of Pub. L. 99-509, 100 Stat. 1951. This increased rate applies to all section 6661 additions to tax assessed after October 21, 1986. . It is apparent from the record as a whole that respondent has established that petitioners' understatement in 1982 was substantial. Petitioners have not established that the amount of the understatement should be reduced pursuant to either of the provisions of section 6661(b)(2)(B). Thus, we sustain respondent's determination that petitioners are liable for the addition to tax under section 6661 at the rate of 25 percent of the underpayment. To reflect the foregoing and concessions made by the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on $ 413.00↩
**. 50 percent of the interest due on $ 317.00↩
***. 50 percent of the interest due on $ 31,696.00↩